1

2

3

4

5

6

7

8

9

10

**United States District Court**
For the Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA TOW TRUCK
ASSOCIATION,

            Plaintiff,

   v.

CITY & COUNTY OF SAN FRANCISCO,

            Defendant.

_____/

No. C 10-03184 CRB

**ORDER GRANTING IN PART AND
DENYING IN PART CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

     If tow trucks or tow firms do business in the City and County of San Francisco
("City"), the City requires them to participate in a permit system ("Permit System").
Plaintiff, the California Tow Truck Association ("CTTA"), seeks a declaration that the
Permit System is preempted by the Federal Aviation Administration Authorization Act
("FAAAA"), along with a no-enforcement injunction and attorney's fees.  The FAAAA
expressly preempts state and municipal laws "related to a price, route, or service of" tow
trucks, 49 U.S.C. § 14501(c)(1), but also expressly preserves state authority to regulate (1)
motor vehicle safety, (2) minimum insurance requirements, and (3) the price of non-
consensual tows, id. §§ 14501(c)(2)(A), (c)(2)(C).

     In December 2010, this Court held that the FAAAA preempted enforcement of the
Permit System with respect to consensual towing and to tow trucks merely passing through
the City on their way to someplace else, but not with respect to non-consensual tows.  Cal.
Tow Truck Ass'n v. City & Cnty. of S.F., No. C 10-03184, 2010 WL 5071602 (N.D. Cal.

United States District Court
For the Northern District of California

1   Dec. 7, 2010) ("CTTA I").  Both sides appealed.  The Ninth Circuit clarified that, while this

2   Court had addressed the Permit System as a whole, case law required the Court to analyze

3   each challenged provision individually.  Cal. Tow Truck Ass'n v. City & Cnty. of S.F., 693

4   F.3d 847 (9th Cir. 2012) ("CTTA II").  The Ninth Circuit remanded for that purpose.

5          On remand, the parties filed cross-motions for summary judgment, both of which rely

6   on the existing evidentiary record.  CTTA MSJ (dkt. 44), City XMSJ (dkt. 45), CTTA Reply

7   (dkt. 46), City Reply (dkt. 47).  For the reasons set forth herein, the Court GRANTS the

8   City's Motion and DENIES CTTA's Motion with respect to all but one of the challenged

9   provisions, which imposes a price cap on the rates towing firms may charge.  That provision

10  aside, the challenged provisions of the Permit System either (1) fall within one of the three

11  exceptions to FAAAA preemption or (2) are not subject to FAAAA preemption in the first

12  place.  As for the preempted price-cap provision, it is an ancillary provision that may be

13  severed without disturbing the remainder of the Permit System.  Finally, the Court holds that

14  the Permit System applies without distinction between consensual and non-consensual tows.

15  ## I.       BACKGROUND

16         CTTA initially brought this action for declaratory and injunctive relief in California

17  state court in July 2010, whereupon the City timely removed to this Court.  Not. of Removal

18  (dkt. 1).  CTTA's Complaint pled a cause of action based on the FAAAA preemption theory

19  now at bar.  Compl. (Not. of Removal, Ex. B) ¶¶ 18-22.  It also pled two causes of action

20  based on state-law preemption, a Fourth Amendment cause of action for illegal seizure, and a

21  dormant Commerce Clause challenge.  Id. ¶¶ 23-44.  At the summary judgment phase, the

22  City and CTTA filed cross-motions for summary judgment on the federal claims.  CTTA also

23  filed a separate motion for summary judgment on the state claims.  On December 7, 2010, the

24  Court partially granted both cross-motions as to the FAAAA preemption issue.  CTTA I,

25  2010 WL 5071602, at *7.  The Court held that the FAAAA preempted the Permit System to

26  the extent that it "applies to tow drivers or tow firms engaged in towing activity other than

27  non-consensual towing."  Id. at *1.  That is, the Court held that the City could not enforce the

28  Permit System with respect to tow trucks and firms that provide only consensual tows or to

tow trucks merely passing through San Francisco, but that the City could enforce the Permit System with respect to tow trucks and firms performing non-consensual tows that begin or end within San Francisco.  Id. at *7.  Turning from the FAAAA preemption issue, the Court rejected the CTTA's Fourth Amendment and dormant Commerce Clause challenges and granted the City summary judgment on those claims.  Id.  The Court then declined to exercise supplemental jurisdiction over the CTTA's remaining state-law preemption claims and remanded those claims to state court.  Id. at *7-8.

Both parties appealed the Court's FAAAA preemption ruling.  On August 27, 2012, a Ninth Circuit panel issued CTTA II.  The Ninth Circuit observed that this Court had analyzed the Permit System as a whole, as opposed to provision-by-provision, and concluded that in doing so the Court had "[run] afoul of American Trucking Associations v. City of Los Angeles, 559 F.3d 1046 (9th Cir. 2009) [('ATA I')], which requires examining the specific provisions" of the permit scheme.  CTTA II, 693 F.3d at 850-51.  The Ninth Circuit emphasized that provision-by-provision analysis is required because the FAAAA's preemption exceptions might encompass some but not all of a particular scheme.  Id. at 860-61.  Without provision-specific analysis, "a single valid excepted provision could allow a vast amount of nonexcepted provisions to stand."  Id. at 863 (quoting ATA I, 559 F.3d at 1055 (brackets omitted)).

The Ninth Circuit remanded the case with instructions "to analyze the major provisions identified by the CTTA," addressing, first, "whether a particular provision is even subject to preemption in the first place," then, if it is, whether the provision is preempted, and then "whether the Permit System can survive, after severing provisions, if any, that are pre-empted (or not saved from preemption by a statutory exception)."  Id.  The Ninth Circuit specifically instructed the Court to consider on remand "intervening caselaw such as ATA III and its discussion of 'mixed motives.'"  Id. at 865 (quoting Am. Trucking Ass'ns v. City of L.A., 660 F.3d 384, 405 (9th Cir. 2011) ("ATA III"), as amended (Oct. 31, 2011), cert. granted in part, No. 11-798, 2013 WL 135529 (U.S. Jan. 11, 2013)).

1    The Ninth Circuit raised two other points pertinent to this remand.  The first flows

2    from the fact that, in the earlier proceeding, this Court distinguished between consensual,

3    non-consensual, and pass-through tows.  The Ninth Circuit regarded this as an "as applied"

4    preemption analysis and instructed this Court to "consider whether it can resolve the

5    preemption questions without analyzing them on an 'as applied' basis."  Id.  As explained in

6    Section III.C below, the Court can and does.  The second matter concerns pass-through

7    towing.  In light of evidence that the City neither applies nor enforces the Permit System with

8    respect to pass-through tows, the Ninth Circuit concluded that CTTA lacked standing to

9    challenge the Permit System as applied to pass-through towing.  Id. at 866 (CTTA members'

10   threat of injury "too 'imaginary' or 'speculative' to support jurisdiction" (quoting Thomas v.

11   Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1139 (9th Cir. 2000))).  Accordingly, on

12   remand, the Court does not address pass-through towing.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

15   Summary judgment is properly entered "if the pleadings, the discovery and disclosure

16   materials on file, and any affidavits show that there is no genuine issue as to any material fact

17   and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see

18   Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477

19   U.S. 242, 256 (1986).  The movant bears the "burden of showing the absence of a genuine

20   issue as to any material fact, and for these purposes the material it lodged must be viewed in

21   the light most favorable to the opposing party."  Adickes v. S.H. Kress & Co., 398 U.S. 144,

22   157 (1970).  The movant is not required to produce evidence negating the non-movant's

23   claims.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885-89 (1990) ("[T]he purpose of

24   Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact

25   essential to the other side's case to demand at least one sworn averment of that fact before

26   the lengthy process of litigation continues.").  If the movant carries its burden, the burden

27   shifts to the nonmoving party to establish facts beyond the pleadings showing that there

28

1    remains a triable issue of disputed material fact so that summary judgment is not appropriate.

2    Celotex, 477 U.S. at 324; Adickes, 398 U.S. at 157.[1]

3                    **B.       FAAAA Preemption**

4          "Congressional intent . . . is the ultimate touchstone of preemption analysis." Engine

5    Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 498 F.3d 1031, 1040 (9th Cir. 2007).

6    "Preemption analysis begins with the 'presumption that Congress does not intend to supplant

7    state law.'" Tillison v. Gregoire, 424 F.3d 1093, 1098 (9th Cir. 2005) (quoting N.Y. State

8    Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654

9    (1995)).  "Although Congress clearly intended FAAAA to preempt some state regulations of

10   motor carriers who transport property, the scope of the pre-emption must be tempered by the

11   'presumption against the pre-emption of state police power regulations.'" Id. (quoting

12   Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).  That is, the Court need not interpret

13   "through a deregulatory prism aspects of the State regulatory process that Congress

14   determined should not be preempted." City of Columbus v. Ours Garage & Wrecker Serv.,

15   Inc., 536 U.S. 424, 440 (2002) (emphasis in original) (internal punctuation omitted).

16         Guided by these presumptions, "analysis of the scope of preemption begins with the

17   text" of the statute.  See Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1060 (9th Cir. 2009).

18   The FAAAA contains an express preemption clause, as well as three express exceptions that

19   are relevant in this case.  The general FAAAA preemption clause states, in pertinent part:

20   "Except as provided in paragraphs (2) and (3), a . . . political subdivision of a State . . . may

21   not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . ."

22   49 U.S.C. § 14501(c)(1).[2]  This law "does not pre-empt state laws that affect rates, routes, or

23   services in 'too tenuous, remote, or peripheral a manner.'" Rowe v. New Hampshire Motor

24   Transp. Ass'n, 552 U.S. 364, 375 (2008) (quoting Morales v. Trans World Airlines, Inc., 504

25   U.S. 374, 390 (1992)).  Rather, it preempts state laws "with a 'significant impact' on carrier

26   rates, routes, or services." Id. (quoting Morales, 504 U.S. at 390).

27   _____

28         [1] Here, the parties agree that the factual record requires no further development before summary judgment.
          [2] The term "motor carrier" encompasses tow trucks. Ours Garage, 536 U.S. at 430.

United States District Court
For the Northern District of California

5

United States District Court
For the Northern District of California

Sections 14501(c)(2)(A) and (c)(2)(C) contain the three relevant exemptions from FAAAA preemption.  Those sections preserve state regulatory authority over (1) motor vehicle safety, (2) minimum insurance requirements, and (3) the price of non-consensual tows.  Specifically, § 14501(c)(2)(A) states that the FAAAA's preemption clause "shall not restrict the safety regulatory authority of a State with respect to motor vehicles" or "the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements . . . ."  Section 14501(c)(2)(C) states that FAAAA preemption "does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle."

### 1.    The Motor Vehicle Safety Exception

The motor vehicle safety exception is the main, though not exclusive, focus of the parties' dispute.  As a starting point, courts need not impose the "narrowest possible construction" of the motor vehicle safety exception.  Tillison v. City of San Diego, 406 F.3d 1126, 1129 (9th Cir. 2005) (quoting Ours Garage, 536 U.S. at 441).  Rather, the "focus in a [FAAAA] preemption case like this one is whether the purpose and intent of the body passing the law at issue, whether state or municipality, was truly safety."  Id.  That is, legislatures may not use a "purported safety regulation" as a Trojan horse for "undue economic regulation."  See CTTA II, 693 F.3d at 860; see also Ours Garage, 536 U.S. at 440 (explaining "deregulatory purpose" of FAAAA); Dilts v. Penske Logistics LLC, 819 F. Supp. 2d 1109, 1116-17 (S.D. Cal. 2011) (in passing FAAAA, Congress sought to (1) "eliminate non-uniform state regulation of motor carriers" and (2) level the playing field between air and motor carriers).  Nevertheless, "safety-related towing laws passed by municipalities may fall within the safety exception to the FAAAA, so long as they are 'genuinely responsive to safety concerns.'"  Tillison, 406 F.3d at 1129 (quoting Ours Garage, 536 U.S. at 442) (emphasis added).

United States District Court
For the Northern District of California

### 2.    Two-Part Test

"[C]ourts apply a two-part inquiry to determine whether a law is 'genuinely responsive to safety concerns.'" CTTA II, 693 F.3d at 860.  In the first step, "courts consider available legislative or regulatory intent—ask whether safety relating to motor vehicles was truly a concern.  Second, courts assess the nexus between the provision at issue and the safety concern—ask whether the regulation sufficiently 'responds to' the concern." Id.

"The first step examines any 'expressions of legislative intent,' including (1) the particular language of the statute or regulation being challenged, and any explicit statutory or regulatory findings in the provision; and (2) available legislative or regulatory history (e.g., committee reports, or statements of lawmakers)." Id. (citations omitted).  However, the cases do not require the "expressions of legislative intent" to come from formal findings, reports, or statements beyond the enactment itself.  See id. at 864.  "[M]erely because a safety rationale is not documented does not necessarily mean the safety exception cannot apply. Sometimes a safety justification is so obvious that it need not be stated—intent can be obvious from the subject of the regulation itself, as well as from the surrounding circumstances." Id.  To ascertain the legislative body's intent, courts may consider contemporaneous records and even non-contemporaneous "testimony from members of the legislative body in question." Id. at 864 n.15.  "A court should be wary, however, about crediting post hoc safety rationalizations that conflict with the contemporaneous legislative record." Id.

"Once a safety motivation is identified, the second step looks to the existing record evidence to determine whether there is a logical or genuine connection between the regulation and the safety justification, or, instead, whether the purported safety justification is a pretext for undue economic regulation." Id. at 860 (internal quotation marks omitted). "The more attenuated or speculative the connection, the more likely it will be that a court will find the purported safety motives 'illusory or pretextual' and that the safety justification will not withstand scrutiny." Id. (citing VRC LLC v. City of Dallas, 460 F.3d 607, 615 (5th Cir. 2006)).  While the safety justification must be genuine, it need not be the only

justification for a particular provision; mixed motives are permissible so long as the challenged provision is "genuinely responsive" to safety concerns.  See ATA III, 660 F.3d at 405 (where provision was partly motivated by environmental concerns, "[t]he presence of such mixed motives . . . does not preclude the application of the safety exception, provided that the State's safety motives are not pre-textual"); see also VRC LLC, 460 F.3d at 615 ("safety and consumer protection are not mutually exclusive categories").

### 3.    Methodology

In an FAAAA preemption case, "a court must analyze a challenge to a comprehensive law on a provision-by-provision basis."  CTTA II, 693 F.3d at 860.  "That is, where a multi-faceted law or regulation is challenged as a whole, it is still necessary to analyze each of its essential or major component parts."  Id.  Otherwise, a single excepted provision might save a law that is otherwise preempted, or vice-versa.  See id.

## III.    DISCUSSION

### A.    CTTA's Challenges

The central dispute in this case is how much, if any, of the Permit System is saved by the FAAAA's motor vehicle safety exception.  In attacking individual provisions of the Permit System, CTTA advances four arguments repeatedly.  To streamline the provision-specific analysis ordered by the Ninth Circuit, the Court first undertakes an analysis of CTTA's linchpin arguments.  As set forth below, each one misses the mark.

### 1.    Wrong Kind of Safety

CTTA argues that, when San Francisco's Board of Supervisors ("Board") enacted the Permit System, it was concerned with the wrong kind of safety.  That is, although CTTA acknowledges that the Permit System evinces a concern with safety, CTTA avers that the Permit System addresses "a different type of safety than that which is permissible under the FAAAA."  CTTA Reply at 7 (emphasis in original).  CTTA's position is that "the safety exception is limited to ordinances that actually address the safe performance of towing services, and does not include general anti-crime measures."  CTTA MSJ at 13 (emphasis added).  Indeed, CTTA goes so far as to say that the plight of a person stranded at night by an

**United States District Court**
For the Northern District of California

illegal tow, though it may present some kind of concern for safety, "cannot fairly be described as having to do with 'motor vehicle safety" because, "by definition, if they are stranded, they have no vehicle."  CTTA Reply at 7 (emphasis added).  CTTA reiterated this view at oral argument.

CTTA's definition of motor vehicle safety is unduly narrow and at odds with Ninth Circuit precedent.  Though the cases do not set forth a "bright line test for what is related to vehicle safety," they do offer "guidance in that regard." ATA I, 559 F.3d at 1054.  In Tillison, the Ninth Circuit held that an ordinance fell within the scope of the motor vehicle safety exception because it

> protect[ed] both the vehicle owner and the public from towing mistakes, which may lead to dangerous confrontations, to the owner and his or her family being stranded at a dangerous time and location, to false vehicle theft reports, which waste law enforcement's limited resources, to unnecessary hazardous tows and to similarly unsafe circumstances.  The ordinance also protects against theft of vehicles from private property.

406 F.3d at 1130-31 (quoting Galactic Towing, Inc. v. City of Miami Beach, 274 F. Supp. 2d 1315, 1319 n.1 (S.D. Fla. 2002) aff'd, 341 F.3d 1249 (11th Cir. 2003)).  Tillison also cites approvingly a California Court of Appeal's remark that "legislation which tends to assist members of the public from involuntarily losing the use of their vehicles and which tends to expedite recovery of their vehicles" evinces a permissible concern with motor vehicle safety. See id. at 1130 (quoting Berry v. Hannigan, 7 Cal. App. 4th 587, 591 (Ct. App. 1992) (brackets omitted)).

Thus, in the FAAAA preemption context, the Ninth Circuit has endorsed a concept of motor vehicle safety that encompasses but surely goes well beyond the safe performance of towing services.  Tillison's notion of motor vehicle safety includes the dangers flowing from a heightened risk of "dangerous confrontations," as well as a concern for stranded motorists' personal safety.  It identifies a legitimate safety concern that arises when "law enforcement's limited resources" are wasted responding to false alarms prompted by improper tows.  It recognizes, too, that property crime, when directed toward towed vehicles, is a motor vehicle safety concern, as is unwarranted interference with an owner's right to reclaim her vehicle.

United States District Court
For the Northern District of California

This concept of motor vehicle safety finds support in the FAAAA's text.  The motor vehicle safety exception preserves "the safety regulatory authority of a State with respect to motor vehicles."  49 U.S.C. § 14501(c)(2)(A).  The City argues that the phrase "with respect to" is best read to signal Congress's intent to avoid a narrower construction.  City Reply at 4 (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983)).  The Court agrees.  The statutory language offers no reason to think that Congress meant to curtail the usual scope of states' "safety regulatory authority" in connection with motor vehicles.  See Ours Garage, 536 U.S. at 442.  Though that authority, being limited to the motor vehicle context, is something less than the full scope of their police power, it surely includes the power to require tow truck drivers and firms to obtain permits.[3]

In arguing for a narrower reading of the motor vehicle safety exception, CTTA leans heavily on two out-of-circuit cases, Dykstra and Northway.[4]  CTTA MSJ at 11-15.  In Dykstra, the Second Circuit held that the FAAAA preempted enforcement of New York City's tow-truck licensing scheme "against out-of-City tow truck operators."  520 F.3d at 212.  While the Second Circuit accepted that the legislative record was "replete with evidence that the City sought to curb a public safety risk by carefully regulating tow trucks engaged in chasing"—the dangerous practice of tow-truck drivers "monitoring police radios and 'chasing' each other to reach the scene of a car accident first"—the Dykstra court nevertheless rejected New York City's argument that the regulations had helped improve

---

[3] The cases that have directly addressed the scope of the states' retained police power in the towing context recognize a limitation on that power. "[A]n exclusion from preemption for all police-power enactments would surely swallow the rule of preemption, as most state laws are enacted pursuant to this authority."  VRC LLC, 460 F.3d at 615 n.7 (internal quotation marks omitted).  "[E]ven if some kind of general public health concerns are (or may be) involved in a statute or regulation—for example control of cigarette usage—that alone does not bring the regulation within the ambit of the motor vehicle safety exception."  ATA I, 559 F.3d at 1054.  "Indeed, if too broad a scope were given to the concept of motor vehicle safety, the exception would swallow the preemption section itself or, at the very least, cut a very wide swath through it."  Id.  Thus, to escape preemption, a state law must be related not just to public safety in general, but to motor vehicle safety.  Id.; see also Dilts, 819 F. Supp. 2d at 1123 (FAAAA preempted trucking company employees' state-law meal and rest break claims because they were "not directly connected to motor vehicle safety").

[4] Auto. Club of New York, Inc. v. Dykstra, 520 F.3d 210 (2d Cir. 2008) (per curiam); Northway Towing, Inc. v. City of Pasadena, Tex., 94 F. Supp. 2d 801 (S.D. Tex. 2000).  Northway was abrogated by Stucky v. City of San Antonio, 260 F.3d 424 (5th Cir. 2001), which in turn was abrogated by Ours Garage.

public safety.  Id. at 216.  It did so because the city had "not presented any evidence" supporting that argument and had "never assessed the effectiveness" of the regulations.  Id. Similarly, in Northway, the Southern District of Texas struck down a permit requirement for tow trucks enacted by the city of Pasadena, Texas.  94 F. Supp. 2d at 803-04.  Pasadena had argued that the permit ordinance fell within the motor vehicle safety exception because, by identifying tow-truck drivers and operators for police, it deterred car theft by persons merely posing as tow-truck drivers.  Id. at 803. The Northway court rejected this argument because the city had "not explain[ed] why its police [could not] adequately identify suspicious tow truck drivers and operators by checking their state-issued driver's licenses and commercial vehicle registrations."  Id.  Further, the court reasoned, "even if the permit ordinance does enable Pasadena police to investigate automobile theft more easily, it does not ensure that the towing and storage of motor vehicles will be performed safely."  Id.  From Northway and Dykstra, CTTA derives the principle that the FAAAA's "safety exception is limited to ordinances that actually address the safe performance of towing services, and does not include general anti-crime measures."  CTTA MSJ at 13.

CTTA is only partly correct.  It is true that the FAAAA does not exempt from preemption general anti-crime measures.  However, the FAAAA does exempt those anti-crime measures which fall within a municipality's regulatory authority with respect to motor vehicle safety.  Critically, that regulatory authority extends to more than just safe tow-truck driving or the tow truck driver's safe use of his equipment.  Rather, "a logical or genuine connection between the regulation and the [motor vehicle] safety justification" will suffice to bring a towing regulation within the ambit of the motor vehicle safety exception.  CTTA II, 693 F.3d at 860 (internal quotation marks omitted).  The Court declines to adopt the narrow construction of motor vehicle safety advanced by CTTA.[5]

---

[5]  As the City points out, City Reply at 7-8, any concern about municipal over-regulation is less than pressing, for Congress has provided a mechanism to deal with over-regulation.  The Secretary of Transportation is authorized by statute "to void any 'State law or regulation on commercial motor vehicle safety' that, in the Secretary's judgment, 'has no safety benefit . . . [or] would cause an unreasonable burden on interstate commerce.'"  Ours Garage, 536 U.S. at 441 (quoting 49 U.S.C. § 31141(a), (c)(4)) (ellipsis and brackets in original).

United States District Court
For the Northern District of California

2.    Wrong Kind of Motive

Closely related to CTTA's argument that the Permit System evinces a concern with the wrong kind of safety is its argument that the Permit System targets impermissible, non-safety objectives.  CTTA singles out several of the Permit System's provisions as addressing consumer protection rather than, or in addition to, safety.  CTTA MSJ at 14, 21; CTTA Reply at 2, 4, 13-14, 16.

The mere existence of a consumer protection (or other non-safety motive) is not, however, problematic in and of itself.  Nothing forbids legislatures that enact towing regulations from harboring mixed motives, so long as their motor vehicle safety motivation is not pretextual and the regulations they enact have a sufficiently logical connection to motor vehicle safety.  See CTTA II, 693 F.3d at 860 ("[T]he presence of such mixed motives does not preclude the application of the safety exception, provided that the [lawmaking body's] safety motives are not pre-textual.") (internal quotation marks, brackets, and ellipsis omitted); see also ATA III, 660 F.3d at 405 (FAAAA did not preempt law motivated by both safety and environmental concerns).  Though CTTA criticizes several provisions of the Permit System as impermissible consumer protection laws, "safety and consumer protection are not mutually exclusive categories."  CTTA II, 693 F.3d at 860 (quoting VRC LLC, 460 F.3d at 615).  The gravamen of the Court's inquiry is whether the purported motor vehicle safety justification is pretextual.  Id.  Accordingly, so long as motor vehicle safety is truly the legislature's concern, even if only one concern among others, then the mere fact that the challenged regulation implicates non-safety legislative objectives does not result in FAAAA preemption.  "Allowing for 'mixed motives' makes sense, for in reality lawmakers may have multiple reasons for enacting laws."  Id.  The relevant question is whether the Board was genuinely (as opposed to exclusively) concerned with motor vehicle safety.[6]

---

[6] CTTA's position finds the most support in Dykstra.  That case, however, appears to be out of step with the law of the Ninth Circuit.  In Dykstra, the Second Circuit appeared to reject one of New York City's towing regulations in part because it sounded in consumer protection and was "not genuinely responsive to safety concerns."  520 F.3d at 216 n.5.  To the extent Dykstra suggests that a towing regulation is not genuinely responsive to safety concerns because it serves a consumer-protection purpose, Dykstra controverts Ninth Circuit guidance on mixed motives and this Court declines to follow it.  See CTTA II, 693 F.3d at 860; ATA III, 660 F.3d at 405; see also Tillison, 406 F.3d at 1128-29 (abrogating an earlier Ninth Circuit case, Tocher, which had struck down a towing regulation because

**United States District Court**
For the Northern District of California

3.      Unresponsive to "Articulated" Safety Concerns

CTTA suggests several times in its briefing that, in order to survive an FAAAA preemption challenge, a towing regulation must be responsive not only to a genuine and exclusive motor vehicle safety concern, but to a genuine, exclusive, and articulated motor vehicle safety concern.  See, e.g., CTTA MSJ at 15 (faulting Permit System for "do[ing] nothing to address the [Board's] articulated safety concerns"); CTTA Reply at 8 (regulations "have nothing whatsoever to do with the narrow public safety concerns articulated in the findings"), 11 ("The City's burden in this case is to show that the scheme they have enacted is 'genuinely responsive' to the [Board's] articulated safety concerns.").  However, the cases impose no requirement for legislatures to "articulate" separate legislative findings supporting their motor vehicle safety enactments.  "Sometimes a safety justification is so obvious that it need not be stated—intent can be obvious from the subject of the regulation itself, as well as from the surrounding circumstances.  [Citation.]  It would elevate form over substance to invalidate permit requirements merely because local lawmakers did not articulate the obvious."  CTTA II, 693 F.3d at 864-65; see also Gregoire, 424 F.3d at 1102-03 (upholding towing regulation even though "legislature did not expressly state a public safety purpose" for it).

The clearest indication of legislative intent in this case consists of the words of the provisions of the Permit System themselves and the subjects they address.  See CTTA II, 693 F.3d at 860.  Neither party has cited legislative history dating from the initial enactment of either Article 30 (the tow driver regulations) or Article 30.1 (the tow firm regulations).  Presumably, that history is nonexistent or lost: Articles 30 and 30.1 were enacted in 1973 and 1997, respectively.  See S.F. Ord. 16-73 (Art. 30); S.F. Ord. 21-97 (Art. 30.1).  In the absence of contemporaneous legislative history, CTTA extensively cites legislative findings that the Board made in 2009 when adding to the long-extant Permit System a requirement that tow firms provide the owners of towed vehicles with a brochure summarizing California

---

it "was intended to further consumer protection rather than safety" (emphasis added)).

United States District Court
For the Northern District of California

towing law.  S.F. Ord. 11-09 (the "2009 Findings"), <u>codified as</u> S.F. Police Code § 3055.2(a),

<u>available at</u> http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/ordinances09/o0011-09.pdf.

It is true that the Court must consider the 2009 Findings—but not to the exclusion of the

primary evidence of the Board's intent, namely the language of the ordinances they passed

and the subject matters regulated thereby.  <u>See</u> <u>CTTA II</u>, 693 F.3d at 864-65; <u>Gregoire</u>, 424

F.3d at 1102-03.[7]

      The City, for its part, relies heavily on the Declaration of Sergeant William Coggan,

the San Francisco Police Department ("SFPD") officer who oversees the City's Permit

System.  Coggan Decl. (dkt. 12) ¶ 2.  Sgt. Coggan's declaration was executed in October

2010.  <u>Id.</u> at 5.  Accordingly, it not direct evidence of the Board's intent when passing

particular provisions of the Permit System, all of which predate the Declaration.  Sgt.

Coggan's Declaration is best regarded as evidence of the context or "surrounding

circumstances" in which the ordinances were passed, <u>CTTA II</u>, 693 F.3d at 864, and the

Court treats it as such.

            4.    <u>No Evidence of Effectiveness</u>

      CTTA argues with some force that, not only must particular provisions of the Permit

System "genuinely" address motor vehicle safety, they must "actually" or "effectively"

address it or else be preempted.  CTTA MSJ at 12-15.  In this vein, CTTA faults the City for

relying on Sgt. Coggan's Declaration since it "is entirely bereft of any <u>statistical data</u>

showing that the incidence of illegal towing from private property declined after the scheme

was implemented."  CTTA Reply at 10 (emphasis added); <u>see also id.</u> at 11 (Coggan's

Declaration contains "<u>no metrics, no statistics, no data</u> whatsoever showing that that [sic]

safety has increased, or that the number of police calls are down, or that illegal towing has

been reduced." (emphasis added)).  In challenging specific provisions, CTTA frequently

reprises its demand for metrics, statistics, or data showing that a provision has "actually"

---

[7]   As the <u>CTTA II</u> panel pointed out, how much light the 2009 findings shed on the Board's intent vis-à-vis earlier enactments is an "open question."  693 F.3d at 861.  The parties have not attempted to provide a definitive answer on remand and the Court need not either.  The challenged provisions themselves provide ample evidence of legislative intent, all of which is consistent with the concerns articulated in the 2009 Findings.

addressed—that is, has been effective at addressing—the Board's articulated concerns.  See id. at 14 ("[n]ot a single iota of evidence" shows that required brochures improve safety), 15 (same, with respect to requirement that tow drivers carry and display permits), 16 (same, with respect to requirement that towers have a police-approved complaint system).

As the City quite rightly points out, however, City Reply at 1, CTTA's demand for statistical data assumes that the FAAAA imposes on the City a duty to generate and marshal such data.  CTTA appears to derive its assumption from Dykstra.  In that case, the Second Circuit faulted New York City for failing to present evidence that the towing regulations it had enacted to reduce "chasing" had actually worked. 520 F.3d at 216.  The Dykstra court disapproved of New York City's never having "assessed the effectiveness of the [anti-chasing] Scheme in fighting chasing." Id. (emphasis added).

To the extent Dykstra would impose on municipalities a requirement to generate and marshal statistical evidence demonstrating the effectiveness of any and all towing ordinances in order to survive a FAAAA preemption challenge, it does not reflect the law of the Ninth Circuit.  The Ninth Circuit cases focus on legislative intent, not legislative effectiveness. See, e.g., Tillison, 406 F.3d at 1129 (disapproving district court analysis that "focus[ed] on the actual effect of the statute" and noting that "[t]he focus of the safety exception to preemption must be on the legislative intent and whether the legislature was acting out of safety concerns").  In an FAAAA preemption case, the Court's task is to ferret out state and municipal economic regulations which merely pose as safety regulations—not, as CTTA and Dykstra seemingly assume, to strike down such regulations unless it can be proved that they work.

At oral argument, CTTA suggested that ATA III requires a showing of legislative effectiveness because the panel in that case upheld a challenged provision on the ground that it "was intended to be and is genuinely responsive to safety."  ATA III, 660 F.3d at 404 (emphasis added).  CTTA's suggestion is misplaced.  The ATA III court upheld the challenged provision not because of any statistical showing—there was none—but because it perceived "a logical connection" between the provision and motor vehicle safety.  Id. at 405.

United States District Court
For the Northern District of California

The ATA III went on to discuss a contrasting situation in Loyal Tire, where the Second Circuit struck down a local towing ordinance in light of record evidence that: the municipality had passed the ordinance to discriminate against an out-of-town tower; parts of the regulation bore no rational relationship to safety; and the city only began to identify safety justifications after litigation had commenced.  Id. (citing Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury, 445 F.3d 136, 146-48 (2d Cir. 2006)).  ATA III stands for the proposition that municipal and state towing ordinances should be upheld absent a showing that their declared safety motives are illusory or pretexts for economic regulation that would thwart the FAAAA's deregulatory purpose.  It does not require states and municipalities to make a detailed statistical showing proving the effectiveness of their regulations.  In the absence of any authority that would impose such a heavy evidentiary burden, the Court declines to place it on the City here.[8]

### B.    Analysis of Specific Provisions of the Permit System

The Permit System is set forth in Articles 30 and 30.1 of the San Francisco Police Code.  Article 30 regulates "tow car drivers" while Article 30.1 regulates "tow car firms." S.F., Cal., Police Code art. 30., §§ 3000-13; id. art. 30.1, §§ 3050-65.[9]  The two Articles regulate drivers and firms in substantially similar ways.  Accordingly, while attending to the Ninth Circuit's instruction to address "each of [the Permit System's] essential or major component parts," CTTA II, 693 F.3d at 860, the Court addresses specific provisions of the Permit System in groups wherever doing so is logical and convenient.

#### 1.    Permit Requirements: Sections 3000 & 3050

Sections 3000 and 3050 require tow drivers and tow firms, respectively, to hold a City-issued permit in order to operate within San Francisco.  S.F. Police Code §§ 3000, 3050. As an initial matter, both permit requirements fall squarely within the FAAAA's general preemption provision.  They are laws enacted by a "political subdivision of a State" which

---

[8]This is not to say that a city or state could never be required to make a detailed evidentiary showing along the lines demanded by CTTA here.  The Court holds only that such a showing is not required in this case because the connection between the purported motor vehicle safety rationales and the actual provisions is direct and obvious, rather than remote or obscure.

[9]  "Tow car" and "tow truck" are synonyms.  CTTA II, 693 F.3d at 851 n.1.

16

United States District Court
For the Northern District of California

are "related to" the "service of any motor carrier." 49 U.S.C. § 14501(c)(1). They clearly

have "more than an indirect, remote, or tenuous effect on" the services of tow-truck drivers

and firms operating within San Francisco, since tow truck operators cannot lawfully render

services at all without a City-issued permit. Gregoire, 424 F.3d at 1099; cf. Galactic Towing,

274 F. Supp. 2d at 1322-23 (holding that motor vehicle safety exception saved Miami

Beach's tow-truck permit requirement). Accordingly, the City's tow-driver and tow-firm

permit requirements are preempted unless they relate to one of the three areas where the

City's regulatory authority has been excluded from FAAAA preemption: motor vehicle

safety, minimum insurance requirements, or the price of non-consensual tows.

      The City argues that the permit requirements fall within all three exceptions. City

XMSJ at 11-12. The Court agrees. While mindful that "the slate is clean" on remand, CTTA

II, 693 F.3d at 865, the Court sees no reason to depart from its earlier determination that

section 3000 and 3050's permit requirements "fall[] within all three preemption exceptions."

CTTA I, 2010 WL 5071602, at *3. As the Court explained at that time, in reasoning that

specifically addressed the Permit System's essential requirement that tow drivers and firms

possess permits:

> Keeping tabs on drivers and firms engaged in non-consensual towing via a
> permit system makes it easier for the City to ensure that insurance requirements
> are being met and reasonable fees are being charged. Further, and more
> importantly given the extent of regulation, the provisions relating directly or
> indirectly to fees and insurance dovetail with the broader safety-related
> purposes of the Permit System—keeping tabs on drivers and firms engaged in
> the inherently dangerous business of non-consensual towing and weeding out
> at the front end those most likely to misbehave.

Id. Additionally, as the City points out, the presence of a permit requirement implies the

threat of permit revocation. City XMSJ at 12 (citing Coggan Decl. ¶¶ 21-23). This makes

the essential permit requirement a tool for policing misconduct in the towing industry. Such

misconduct clearly bears on motor vehicle safety, whether directly, as in the case of illegal

towing or intentional interference with the retrieval of towed vehicles, or indirectly, as when

police resources are diverted to an investigation into the propriety of a tow. See Tillison, 406

F.3d at 1130-31. Moreover, the essential requirement of a permit enables the City to "weed

out" and "keep tabs on" tow drivers and firms who, otherwise, would be free to flout safety,

17

United States District Court
For the Northern District of California

1  insurance, or price requirements until and unless they were caught in some other improper

2  act.

3      CTTA, focusing exclusively on the motor vehicle safety exception and ignoring the

4  other two, strenuously disagrees.  See CTTA MSJ at 15, 18.  Relying on Dykstra and

5  Northway, CTTA argues that the permit requirement must be struck down because it is

6  "facially" unconcerned with safety and "does nothing" to actually increase safety.  CTTA

7  MSJ at 15.  CTTA opines that "[s]afety might be achieved by requiring tow truck drivers to

8  pass a driving test, or to demonstrate competence in towing motor vehicles, but merely

9  requiring them to obtain a permit does nothing for safety."  Id.

10      CTTA's challenge to the permit requirements assumes that the permit requirements

11 must have some "facial" concern with safety.  But that is not so.  In Gregoire, for instance,

12 the Ninth Circuit turned aside an FAAAA preemption challenge to a Washington state

13 statute, notwithstanding the fact that the statute did "not expressly declare a public safety

14 purpose."  424 F.3d at 1101.  Similarly misplaced is CTTA's suggestion that the permitting

15 requirement must "do something" to increase safety—that is, must actually or effectively

16 increase safety.  The cases impose no such requirement of legislative effectiveness, only a

17 requirement that the legislation be "genuinely" responsive to motor vehicle safety, as

18 opposed to a mere pretext for economic regulation that would undermine the deregulatory

19 purposes of the FAAAA.  Lastly, Ninth Circuit cases evince a notion of motor vehicle safety

20 that extends well beyond "requiring tow truck drivers to pass a driving test" or

21 "demonstrat[ing] competence in towing motor vehicles."  See CTTA MSJ at 15.

22      The essential requirement that tow drivers and tow firms obtain City-issued permits

23 before transacting business within San Francisco enables other provisions of the Permit

24 System to work.  As set forth below, several of those other provisions regulate motor vehicle

25 safety more directly.  The essential permit requirement regulates indirectly, through the other

26 requirements it enables.  But to say that the permit requirement regulates indirectly is not to

27 suggest that it is less than "genuinely responsive" to motor vehicle safety (or, as the case may

28 be, somehow not "related to" insurance or the price of non-consensual tows).  On the

18

contrary, the connection between the requirement that tow trucks and firms obtain a permit has an obvious, logical, and genuine connection to motor vehicle safety.  Most importantly, nothing in the record suggests that the City's permit requirement is a pretext for economic regulation: While the City charges a fee for permit application and renewal, it is undisputed that the City may only use those fees to defray the cost of the Permit System.  If that is a scheme to fill the City's coffers, it is an odd one.

The Court GRANTS the City's Motion and DENIES CTTA's Motion as to the essential permitting requirement embodied in sections 3000 and 3050.

2.   <u>Permit Application Requirements: Sections 3002 & 3052</u>

Section 3002 sets forth the requisite contents of a tow-driver permit application; section 3052 does the same for tow-firm applicants.  <u>See</u> S.F. Police Code §§ 3002, 3052. Section 3002 requires tow-driver permit applicants to provide their name, address, height, weight, eye and hair color, date of birth, the name and address of their employers, their California driver license number (as well as any restrictions thereon), a list and description of all criminal arrests, and other information as requested by the Chief of Police.  Similarly, section 3052 requires applicants for a tow-firm permit to provide, <u>inter alia</u>, identifying information for the firm owner, identifying information for each tow truck operated by the firm, a description of the firm's business plan, "a system for handling complaints that is acceptable to the Chief of Police," the name and permit number of the firm's drivers, evidence of minimum insurance coverage, and a record of all the applicant's criminal convictions.

As a preliminary matter, the Court notes that both parties have assumed without discussion that these code sections fall within the scope of FAAAA preemption by significantly impacting "carrier rates, routes, or services," <u>Rowe</u>, 552 U.S. at 375, and proceed directly to arguing whether the motor vehicle safety exception applies.[10]  The

---

[10] The closest either party comes to addressing the threshold question of whether sections 3002 and 3052 are preempted "in the first place," <u>CTTA II</u>, 693 F.3d at 863, is when CTTA identifies various ways the Permit System "impacts" its members, apparently in an effort to demonstrate how the Permit System as a whole falls within the FAAAA's preemptive scope, <u>see</u> CTTA MSJ at 8-9.  These impacts include the potential impound of non-permitted tow trucks, the cost of obtaining a permit and attendant impact on prices charged to customers, the impact on "routes and services" that occurs when "drivers

United States District Court
For the Northern District of California

parties' assumption, while not unassailable, is ultimately correct.[11]  Accordingly, the Court turns to the question of whether the motor vehicle safety exemption saves the permit application requirements.

CTTA first attacks the provisions of the Permit System that require applicants to provide identifying information for tow drivers and their trucks, arguing that "the fact that police can more easily identify drivers does nothing to improve towing safety."  CTTA MSJ at 16.  What CTTA means by "towing safety," however, is the safe driving of tow trucks. See id.  That is not the only type of safety that the City may regulate without fear of preemption.  See supra Section III.A.1 (Ninth Circuit countenances broader notion of motor

---

[11] who do not have a permit are forced to take alternate routes around the City," the impact of regulatory costs on "the ability of [towing] companies to grow and expand their business[es]," and increased response times for drivers who "have refused to obtain the required permits." Id. at 9. Even assuming *arguendo* that all of these impacts may be laid at the City's feet, they speak only to the effect on prices, routes, and services of having no permit. That is to say, they do not speak to the effect on rates, prices, and services that flows from, for example, the requirement that applicants provide identifying information in their applications, see S.F. Police Code §§ 3002(1)(4), 3052(1)-(4), or the requirement that applicants divulge a record of their criminal arrests, id. §§ 3002(5), 3052(7). CTTA has not made a threshold showing that each challenged provision of the Permit System falls within the FAAAA's preemptive scope.

[11] ATA III illustrates why. In that case, the Port of Los Angeles required drayage carriers (that is, truckers) who sought to work out of the Port to sign a concession agreement. As part of the concession agreement, the carriers had to demonstrate their "financial capability to perform [their] obligations." ATA III, 660 F.3d at 403. The Ninth Circuit held that this "financial capability" requirement did not fall within the scope of FAAAA preemption because it neither "directly impact[ed] the drayage services provided to customers," nor "directly regulate[d] the routes served or the prices charged," nor "indirectly" bound the truckers to providing "particular rates, routes, or services" regardless of what market conditions would dictate. See id. at 403-04. The ATA III court based its holding, however, at least in part on evidence that "[t]he Port [had] never refused to sign a concession agreement on the basis of the financial capability provision" and testimony from the regulated motor carriers "that the financial capability provision would not change their operations." Id. at 404. The applicable principle, then, appears to be: If information collected in the course of a permit application has led or could lead to denial of the application or to a change in the manner of operation of a regulated carrier, then the requirement to provide that information falls within the preemptive scope of the FAAAA, since denial of the application would prevent the applicant from rendering "service" in the first instance and a change in the manner of operation would alter "services" in a manner not dictated by market conditions. Here, sections 3004 and 3054 govern the City's review process for, respectively, tow-driver and tow-firm permit applications. Section 3004 provides that when the Chief of Police receives a tow driver application, he "shall" investigate the application, give the applicant a hearing, and then "grant such application unless he finds," *inter alia*, that the applicant "[h]as intentionally falsified any statement contained in his application." S.F. Police Code § 3004(c) (emphasis added). Section 3054 similarly requires the Chief of Police to grant completed tow firm applications unless, *inter alia*, "[t]he applicant has knowingly falsified any statement contained in his application . . . ." Id. § 3054(4) (emphasis added). In sum, the Chief of Police must deny an application that contains "any" knowingly falsified information. The application requirements here, then, are not the same type of window-dressing requirements considered in ATA III, for they can result in the denial of at least some applications.

vehicle safety).  The Board's intent in enacting the identification requirements is obvious: The requirements are designed to enable the City to more rapidly identify and locate the drivers and firms responsible for improper tows and, thereby, to increase deterrence and aid enforcement of motor vehicle safety laws.

Proceeding to the second step of the analysis, there can be no question that the "existing record evidence," CTTA II, 693 F.3d at 860, shows a logical connection between the information-collection requirements and the Board's motor vehicle safety justification. Sgt. Coggan's Declaration states that SFPD "uses the personal information provided by tow companies and drivers during the application process . . . to investigate complaints, and to track down company officials or employees who are alleged to have stolen a vehicle, overcharged for a tow, or otherwise operated in a manner that threatens the safety of the public."  Coggan Decl. ¶ 10.  CTTA offers no evidence to undercut that statement or, more to the point, to suggest that the identification requirements are a "pretext for undue economic regulation."  CTTA II, 693 F.3d at 860.  Indeed, what such a pretext might be is difficult to imagine.  The identification requirements are genuinely responsive to the motor vehicle safety concerns evident from the face of sections 3002 and 3052.  Accordingly, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to the identification requirements embedded in those sections.

Sections 3002 and 3052, however, contain more than just identification requirements. CTTA's challenges to the other requirements are addressed separately below.

3.      Criminal Activity Reporting Requirements: Sections 3002(5), 3004(a-b), 3011, 3052(7), 3054(3) & 3056(1)

The Permit System requires applicants for a tow-driver permit to divulge their criminal arrest records.  S.F. Police Code § 3002(5).  With respect to convictions, it requires the Chief of Police to deny the application of anyone who "has been convicted of burglary, robbery, theft, receipt of stolen property, breaking or removing parts from a vehicle, malicious mischief to a vehicle[,] unlawful use or tampering by bailee of a vehicle, or altering a vehicle identification number" up to four years before applying.  Id. § 3004(a).  It

**United States District Court**
For the Northern District of California

1  also requires the Chief to deny the application of anyone found to have "acted in violation

2  of" those criminal statutes, regardless of whether a conviction ensued.  See id. § 3004(b).

3  The Chief also must revoke a tow driver's permit "if after a hearing on the matter he finds

4  that grounds exist which would have constituted just cause for refusal to issue such a

5  permit."  Id. § 3011.

6       As for tow-firm permit applicants, section 3052(7) requires them to divulge "all

7  crimes of which the applicant has been convicted, plead guilty, or plead no contest."  The

8  Chief shall deny a tow-firm permit to any applicant who

9       has been convicted of theft, petty theft, theft of a vehicle, breaking or removing
        vehicle parts, malicious mischief to vehicle, check fraud, credit card fraud, driving
10      under the influence of alcohol or drugs, vehicular manslaughter, reckless driving
        bodily injury, any sex offense which would cause the applicant to be registered as a
11      sex offender, any unlawful carrying, use or possession of a firearm, any assault or
        battery (misdemeanor or felony), kidnapping, arson, extortion, murder, possession of
12      alcoholic beverage, opened alcohol container, marijuana, or narcotic drug while
        driving, [or] bailee tampering[.]
13

14  Id. § 3054(3).  This code section does not specify a limitations period, but section 3056(1)

15  apparently provides one: That section authorizes the Chief  to "suspend or revoke" any tow

16  firm's permit if "[w]ithin five years prior to the date of application the applicant has been

17  convicted of" one of the crimes listed in § 3054(3).

18       CTTA raises a number of objections to these reporting requirements, but the Court

19  need not delve into an extended discussion of them.  Assuming without deciding that each of

20  the challenged sections is subject to preemption, the Court determines that the motor vehicle

21  safety justification of ordinances that require tow drivers and tow firm operators to report and

22  refrain from criminal activity "is manifest."  Cole v. City of Dallas, 314 F.3d 730, 735 (5th

23  Cir. 2002).  In Cole, the Fifth Circuit turned aside an FAAAA preemption challenge to a

24  Dallas city ordinance that "prohibit[ed] persons from receiving a wrecker driver's permit to

25  tow motor vehicles if they ha[d] a criminal history including certain specified criminal

26  convictions, documented mental illnesses or unsafe driving records."  Id. at 732.  The Cole

27  court commented that it was "difficult to imagine a regulation with a more direct protective

28  nexus or peripheral economic burden."  Id. at 735.  The same holds true here.  Few

1   regulations could bear more directly on motor vehicle safety than those that seek to prevent

2   auto thieves, drunk drivers, check forgers, or extortion artists, to name a few, from

3   participating in an industry which entrusts them with automobiles, with drivers' sensitive

4   financial information, and, often, with the bodily safety of those they serve.

5        The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to

6   the criminal activity reporting requirements set forth in sections 3002(5), 3004(a-b), 3011,

7   3052(7), 3054(3), and 3056(1).

8        4.        Permit Fee Requirements: Sections 3003 & 3053

9        CTTA challenges sections 3003 and 3053, which, in substantially similar language,

10   require permit applicants to pay both a filing fee and a "[f]ingerprinting fee . . . to cover the

11   cost of fingerprinting, classifying and searching of" fingerprint records.  As an initial matter,

12   these requirements have something more than a tenuous or remote connection to the services

13   of tow truck drivers and firms in San Francisco, since failure to pay the required fee

14   presumably results in rejection of the application.  See ATA III, 660 F.3d at 403 (application

15   requirements that cannot or do not result in application denial fall outside FAAAA's

16   preemptive scope because they do not impact motor carrier services).  Accordingly, the

17   permit fee requirements must fall within one of the exceptions to FAAAA preemption to

18   survive CTTA's challenge.

19        The Court concludes that the permit fee requirements fall within all three exceptions.

20   They are simply a mechanism for funding the Permit System, so the rationales applicable to

21   the essential permit requirements, sections 3000 and 3050, apply to sections 3003 and 3053

22   as well.  The permit fee requirements enable the operation of the more direct regulatory

23   mechanisms embedded within the Permit System, and thus regulate in the same areas as the

24   Permit System itself.  The fact that the permit fee requirements regulate somewhat more

25   indirectly is not by itself fatal, for, like the essential permit requirements themselves, they

26   remain "logically" and "genuinely" connected to obvious concerns.  Cf. CTTA II, 693 F.3d

27   at 860.  CTTA points to no evidence suggesting an improper motivation for collecting permit

28   fees.  Rather, as CTTA appears to acknowledge, the City may only use the permit fees to

United States District Court
For the Northern District of California

administer the Permit System.  In the absence of any showing that the permit fees are a hidden revenue-generating mechanism, or a pretext for some other sort of impermissible economic regulation, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to sections 3003 and 3053.

> 5.    Permittee Insurance Requirements: Sections 3052(6), 3056(5) & 3058

Section 3052(6) requires tow-firm permit applicants to provide "[e]vidence of insurance at least equal to the minimum established in the Chief of Police rules."  Section 3056(5) requires tow-firm permittees to maintain required levels of bodily injury and property damage insurance, on pain of permit revocation or suspension.  Lastly, section 3058(a) requires permittees to provide proof of such insurance on a semiannual basis.

These requirements fall squarely within the FAAAA's preservation of state and local authority "to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization."  See 49 U.S.C. § 14501(c)(2)(A).  CTTA complains that these provisions allow San Francisco to impose "different"—that is, higher—insurance requirements than those required by the state of California.  CTTA MSJ at 19.  CTTA concludes that this "contradicts the spirit of the FAAAA exemption," which Congress designed to "eliminate multiple and contradictory regulations by states . . . ."  Id. (citing Ours Garage, 536 U.S. at 440).  Whatever the "spirit" of § 14501(c)(2)(A), its text preserves state regulatory authority with regard to minimum insurance coverage.  And no careful reader of Ours Garage could miss that case's central holding "that § 14501(c)(2)(A) spares from preemption local as well as state regulation." 536 U.S. at 442 (emphasis added).  Lest any doubt remain, Ours Garage specified that its holding applied to both the safety and the insurance aspects of § 14501(c)(2)(A).  See id. There is no merit to CTTA's argument that the FAAAA preempts the Permit System's minimum insurance requirements.

The Court GRANTS the City's Motion, and DENIES CTTA's Motion, with respect to sections 3052(6), 3056(5), and 3058.

6.      Brochure Requirement: Section 3055.2

Section 3055.2 requires tow firm operators to keep and conspicuously display brochures summarizing certain aspects of California towing law.  This code section is unusual among those reviewed here in that it is the only section for which the Board articulated specific legislative findings, the same 2009 Findings discussed in Section III.A.3. The findings are contained in paragraph (a) while the substance of the regulation is set forth in paragraphs (b) through (f).  Paragraph (b) requires the brochure to present "a concise summary of California law, including the maximum rate that can be legally charged for a private property tow and the rights and responsibilities of all parties who participate in towing from private property: real property owners, vehicle owners, tow car operators and tow car firms."  S.F. Police Code § 3055.2(b).  The brochure must be displayed in Chinese, English, and Spanish, and "in a conspicuous place" where it will be seen by vehicle owners coming to reclaim their towed vehicles.  Id. § 3055.2(c).  Notably, the brochure must be made available "without assistance from" tow firm employees and before owners must pay their bill.  Id.  Funding for the brochure program comes from permit fees.  See id. § 3055.2(e).  The penalty for noncompliance with the brochure requirement is a $500 fine.  Id. § 3055.2(f).

The City argues that the brochure requirement is not subject to preemption in the first instance and that, even if it were, it would be saved by the safety exception and, at least partly, the price exception.  City XMSJ at 17.  The first part of the City's argument is incorrect.  As CTTA points out, laws that require a motor carrier to provide a service that they otherwise would not are subject to FAAAA preemption.  See Rowe, 552 U.S. at 376.  The second part of the City's argument, however, is correct.  The 2009 Findings strongly suggest that when the Board enacted the brochure requirement, it was concerned with several things, and that motor vehicle safety was among them.  See generally S.F. Police Code § 3052(a). For instance, the Board found that "there are frequent incidents of illegal towing from private property in San Francisco."  Id. § 3052(a)(i).  The Board identified a variety of difficulties that San Francisco visitors and residents might encounter when attempting to retrieve a

United States District Court
For the Northern District of California

towed car, including the imposition of large reclamation fees for autos that had been improperly towed in the first instance. Id. § 3052(a)(v). The brochure requirement is obviously aimed at discouraging improper towing and reducing tow firms' incentive to take advantage of the owners of towed vehicles (for instance, by demanding extortionate fees). Such legislation, "which tends to expedite recovery" of towed vehicles and prevent illegal tows, evinces a genuine motor vehicle safety concern. Tillison, 406 F.3d at 1130. Further, by explaining the rights and responsibilities of all involved, the brochure requirement aims to defuse conflicts over those rights and responsibilities before dangerous confrontations flare up and require police intervention. See id.

The Court concludes that the brochure requirement is genuinely responsive to motor vehicle safety.[12] Accordingly, the Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to the brochure requirement.

### 7.    Other Challenged Provisions

The rest of the provisions challenged by CTTA bear less extensive discussion.

Sections 3007 and 3056 both impose requirements that tow drivers and firms, respectively, display their permits at all times. These requirements are not subject to FAAAA preemption because displaying a permit does not constitute a "service" within the meaning of 49 U.S.C. § 14501(c)(1). There is no market for the service of "displaying permits" and therefore no market conditions for the FAAAA to protect from local regulation. See Rowe, 552 U.S. at 373 (deeming preempted a state law that "[froze] in place and immunize[d] from competition a service-related system that carriers [did] not (or in the future might not) wish to provide"). The Court GRANTS the City's Motion and DENIES CTTA's Motion with respect to sections 3007 and 3056.

Sections 3012 and 3064 make it a misdemeanor for tow drivers and firms, respectively, to fail to obtain the required permits. These sections survive CTTA's challenge

---

[12] CTTA derogates the City's justification of the brochure requirement as mere "consumer protection," and faults the City for failing to identify "a single iota of evidence" showing that the brochures effectively reduce "the perceived ills." CTTA Reply at 14-15. For the reasons stated in Sections III.A.2 (consumer protection and motor vehicle safety motivations are compatible) and III.A.4 (no requirement for governments to produce evidence of legislative effectiveness), these objections lack merit.

1    because, even if they could be said to impact "service" by criminalizing failure to obtain a

2    permit, they would be saved from preemption for all the reasons that the permit application

3    and permit fee requirements—other "enabling" provisions—were saved.  See supra Sections

4    III.B.2, III.B.4.  The Court GRANTS the City's Motion and DENIES CTTA's Motion with

5    respect to sections 3012 and 3064.

6        Section 3052(4) requires tow firm applicants to submit their business plans to the

7    City.  As a threshold matter, it is far from clear that the business-plan submission

8    requirement falls within the preemptive scope of the FAAAA in the first instance, since

9    nothing in the Permit System indicates that an unsatisfactory business plan could (1)

10   constitute grounds for denial, suspension, or revocation of a tow firm permit or (2) require

11   the applicant to change its manner of doing business.  See S.F. Police Code §§ 3054 (grounds

12   for denial), 3056 (grounds for suspension or revocation).  Assuming arguendo, however, that

13   the business-plan submission requirement is subject to preemption, it would be saved by its

14   obvious motor vehicle safety justification: In enacting this provision, the Board's palpable

15   design was to allow SFPD to ascertain whether a permitted towing firm would be able to

16   make ends meet without resorting to illegal means like, for example, overcharging for tows,

17   or turning a license to tow cars into a license to steal them.  As Sgt. Coggan's Declaration

18   discreetly puts it, the business-plan disclosure requirement allows SFPD to "determine

19   whether the amount charged by a tow company is commensurate with the services it

20   regularly provides."  Coggan Decl. ¶ 15.  The business-plan disclosure requirement is both

21   obviously and directly connected to motor vehicle safety and thus not preempted.  The Court

22   GRANTS the City's Motion and DENIES CTTA's Motion with respect to section 3052(4)'s

23   business-plan disclosure requirement.

24       Section 3052(4) also requires tow firms to establish "a system for handling complaints

25   that is acceptable to the Chief of Police."  This provision falls within the FAAAA's

26   preemptive scope because it requires tow firms to provide the service of systematically

27   handling complaints.  See Rowe, 552 U.S. at 375-76 (FAAAA preempts statutes that "require

28   motor carrier operators to perform certain services, thereby limiting their ability to provide

United States District Court
For the Northern District of California

1   incompatible alternative services" regardless of market conditions).  The market, left to its

2   own devices, might discourage tow firms from offering a complaint system, for example, to

3   cut customer service costs.  Nevertheless, the complaint-system requirement has at least two

4   obvious motor vehicle safety rationales.  First, having such a complaint system in place could

5   reduce the incidence of heated confrontations between tow firm employees and drivers

6   whose vehicles have been towed.  Such a motivation is legitimately within the scope of

7   "motor vehicle safety."  See Tillison, 406 F.3d at 1130-31.  Second, by diverting customer

8   complaints to the tow firms, it reduces the likelihood that law enforcement will have to

9   expend its own resources dealing with those complaints.  Id.  Sgt. Coggan's Declaration sets

10  forth these two justifications, Coggan Decl. ¶ 16, and nothing suggests they are less than

11  genuinely responsive to motor vehicle safety concerns.  The Court GRANTS the City's

12  Motion and DENIES CTTA's Motion with respect to the complaint-system requirement of

13  section 3052(4).

14          Section 3060 requires each permit-bearing tow firm to "maintain a record of each

15  vehicle towed," keep those records for three years, and make the records "available for

16  inspection by any peace officer."  This requirement constitutes a "service" under 49 U.S.C. §

17  14501(c)(1) because it requires towing firms to alter their manner of doing business in a

18  manner not dictated by market forces.  See Rowe, 552 U.S. at 375-76.  However, the

19  provision is saved by the motor vehicle safety exception.  The provision is obviously

20  motivated by a concern that, without such records, law enforcement's efforts to detect

21  improper tows after the fact may be complicated or stymied altogether for lack of a paper

22  trail.  Cf. Coggan Decl. ¶ 20.  CTTA presents no evidence to the contrary, instead faulting

23  section 3060 for being unresponsive to any "articulated" safety concern and for being a

24  "consumer protection" law.  CTTA MSJ at 21; CTTA Reply at 16.  Neither of these

25  arguments is persuasive.  See supra Sections III.A.2-3.  The Court GRANTS the City's

26  Motion and DENIES CTTA's Motion with respect to section 3060.

27

28

### 8.     One Preempted Provision: Section 3056(2)

The Court turns, finally, to the one provision in the Permit System that is preempted. Section 3056(2) authorizes SFPD to suspend or revoke the permit of any tow firm that imposes "towing, storage or other charges in excess of the maximum rate established by the [City] for its contracted tow car firms."  This provision has the effect of transforming the City's contract rate for public property tows into a price cap for all tows, enforced by threat of revocation of the firm's permit.  Thus, section 3056(2) clearly falls within the preemptive scope of 49 U.S.C. § 14501(c)(1) by regulating the price tow firms may charge.  The question, then, is whether an exception saves it.

The City cites the FAAAA's "price" exception, 49 U.S.C. § 14501(c)(2)(C).  That section, however, saves only those regulations related to the price of non-consensual tows.[13] Section 3056(2) does not distinguish between non-consensual and consensual tows and therefore caps the price of both.  As such, it exceeds the protection of § 14501(c)(2)(C). Accordingly, the Court GRANTS CTTA's Motion and DENIES the City's Motion with respect to section 3056(2)'s cap on towing fees and deems that provision preempted by the FAAAA to the extent that it regulates the price firms may charge for consensual towing, storage, or ancillary services.[14]

Because Article 30.1 of the Permit System contains a severability clause, S.F. Police Code § 3065, deeming section 3056(2) partly preempted requires the Court to address the severability issues identified in CTTA II.  See 693 F.3d at 863.  First, the Court must

---

[13]   The FAAAA's price exception is not often litigated, but the few authorities that the Court has found are unanimous: §14501(c)(2)(C) saves regulations relating to the price of non-consensual tows, but not those regulating the price of consensual tows.  See Ace Auto Body & Towing, Ltd. v.N.Y.C., 171 F.3d 765, 777-78 (2d Cir. 1999) (city conceded regulation of prices of consensual tows to be preempted); Helmrich Transp. Sys., Inc. v. City of Phila., No. Civ.A.02-2233, 2004 WL 2278534, at *6 (E.D. Pa. Oct. 8, 2004) (similar fee cap regulation preempted with respect to consensual but not with respect to non-consensual tows); Hous. Prof'l Towing Ass'n v. City of Hous., No. Civ.A. H-05-0323, 2005 WL 2121552, at *8 (S.D. Tex. Aug. 31, 2005) (stating without discussion that price of "a consent tow . . . cannot be regulated"); cf. Gregoire, 424 F.3d at 1100 (turning aside preemption challenge from tower who conducted non-consensual tows in part on ground that FAAAA allows regulation of prices of those tows); Indep. Towers of Wash. v. Wash., 350 F.3d 925, 931 (9th Cir. 2003) (focusing on non-consensual towing).

[14]   Section 14501(c)(2)(C) refers to "transportation," which the FAAAA defines broadly to include not only towing but "storage."  See 49 U.S.C. § 13102(23); Ware v. Tow Pro Custom Towing & Hauling, Inc., 289 F. App'x 852, 856 (6th Cir. 2008).

determine how much of section 3056(2) to sever.  "Severability of a local ordinance is a question of state law."  City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 772 (1988).  The parties apply to California law on this question.  Under California law, an invalid provision must be severed if it is

> grammatically, functionally and volitionally separable [from the rest of the text]. . . .
> It is grammatically separable if it . . . can be removed as a whole without affecting the
> wording of any of the measure's other provisions.  It is functionally separable if it is
> not necessary to the measure's operation and purpose.  And it is volitionally separable
> if it was not of critical importance to the measure's enactment.

Hotel Emps. & Rest. Emps. Int'l Union v. Davis, 21 Cal. 4th 585, 613 (1999) (internal quotation marks and citations omitted).  Here, the Court strikes down section 3056(2) in its entirety because the preempted portion is not grammatically severable from the non-preempted portion.  The provision regulates the price of consensual and non-consensual tows alike, without making any distinction between them.  Hence, the Court could not sever the preempted portion (relating to consensual tows) from the non-preempted portion (relating to non-consensual tows) without rewriting the ordinance.  Accordingly, the Court ENJOINS the City from enforcing section 3056(2) in its entirety.

The next question is whether the Permit System can still stand without section 3056(2).  CTTA II, 693 F.3d at 863.  Quite obviously, it can, as both sides conceded at oral argument.  Enjoining only section 3056(2) does not require this Court to disentangle a "complex regulatory web."  United States v. Manning, 527 F.3d 828, 840 (9th Cir. 2008).  On the contrary, section 3056(2) is ancillary (at most) to the operation of the entire Permit System.  The Court holds that the Permit System, minus section 3056(2), remains undisturbed.

## C.    Application of Permit Scheme to Consensual Towing

In CTTA I, this Court held that the Permit System, taken as a whole, was preempted to the extent the City sought to enforce it against pass-through towers and consensual towers, but not preempted to the extent the City enforced it against non-consensual towers.  2010 WL 5071602, at *1.  On appeal, the Ninth Circuit described the Court as having failed to address "an open issue—whether a federal law can ever preempt state law on an 'as applied'

basis, that is, whether it is proper to find that federal law preempts a state regulatory scheme sometimes but not at other times, or that a federal law can preempt state law when applied to certain parties, but not to others." CTTA II, 693 F.3d at 865.  The Ninth Circuit directed this Court to consider on remand "whether it can resolve the preemption questions without analyzing them on an 'as applied' basis, and if not, whether further briefing is necessary." Id.  The Court determines that it need not analyze any of the challenged provisions on an "as applied" basis.  Each of the challenged provisions of the Permit System that survives preemption analysis does so whether it is considered in the context of consensual or non-consensual tows.  And, as the Court just explained, the one preempted provision, section 3056(2), is preempted in both the consensual and non-consensual contexts due to its lack of severability.

In its earlier opinion, the Court explained that it understood the first step of the motor-vehicle safety exception analysis to limit it to "review[ing] legislative expressions of intent and then determin[ing] whether the regulation fairly serves to address the identified safety concerns." CTTA I, 2010 WL 5071602, at *5.  The Court then examined only independent legislative expressions of intent that it had before it—the 2009 Findings.  The Court identified in those findings a concern for the safety impacts of non-consensual tows, but not for consensual or pass-through tows.  Accordingly, the Court held that the Permit System went too far when it regulated in those areas.  The CTTA II court suggested, however, that this Court went awry when it limited its inquiry to the 2009 Findings.  The Ninth Circuit explained that the Court need not limit its review to formal expressions of legislative intent to the exclusion of the plain language of the challenged code sections and their subject matter. See CTTA II, 693 F.3d at 864-65.

The Court has remained mindful of that guidance while analyzing each of the challenged provisions.  In doing so, the Court has concluded that several of the challenged provisions are not subject to FAAAA preemption in the first instance.  As for the provisions that are subject to FAAAA preemption, with only two exceptions,[15] they are saved by the

---

[15] The two exceptions are the minimum insurance requirements, which are saved from preemption by 49 U.S.C. § 14501(c)(2)(C), and section 3056(2), which is preempted.

United States District Court
For the Northern District of California

motor vehicle safety exemption for reasons that apply in the consensual towing context as well as the non-consensual.  For instance, a number of the challenged provisions seek to weed out potential criminals from the towing industry; in so doing so, they evince a concern with safeguarding the financial safety of parties who may divulge their sensitive financial information to tow drivers and tow firms.  Both consensual and non-consensual tows require the exchange of financial information.  The challenged provisions also evince a concern for the bodily safety of persons who, in the case of consensual tows, will find themselves interacting with drivers roadside and sometimes riding in the cab alongside them.  Other provisions are "enabling" provisions that allow the basic requirement of a permit to operate, with its attendant screening and deterrent effects.  Yet other provisions, such as the requirement of an acceptable complaint system and the brochure requirement, are equally justified by motor vehicle safety concerns whether the underlying nature of the tow is consensual or non-consensual; time-consuming and potentially dangerous disputes can break out even amongst willing parties to a transaction.

CTTA, for its part, identifies no evidence to suggest that the motor vehicle safety or other identified exceptions possess any less force in the consensual context.  Rather, CTTA suggests that the Board's expressions of intent in the 2009 Findings somehow matter more than the legislative intent obviously discernible in the text of the Permit System as enacted.  See CTTA Reply at 17.  That suggestion is misplaced.  Nothing in CTTA II implies that articulated legislative findings appended to a law are more probative of legislative intent than the law itself.  See 693 F.3d at 864-65.  On the contrary, CTTA II observed that the 2009 Findings offer questionable proof at best of what the Board intended when passing earlier-enacted provisions of the Permit System.  Id. at 861.

In the absence of any showing by CTTA through evidence or argument that some principled reason exists to strike down particular provisions of the Permit System as applied to consensual tows, the Court declines to do so.

United States District Court
For the Northern District of California

1  **IV.     CONCLUSION**

2          For the foregoing reasons, the Court GRANTS the City's Motion and denies CTTA's

3  Motion, except with respect to section 3056(2), which imposes a rate cap on all towing

4  conducted in San Francisco.  With respect to section 3056(2), the Court GRANTS CTTA's

5  Motion and DENIES the City's Motion.  The Court SEVERS section 3056(2) and ENJOINS

6  its enforcement.  Because severing section 3056(2) does not so disable the Permit System as

7  to impede its continued enforcement, the rest of the Permit System remains undisturbed.

8          **IT IS SO ORDERED.**

9

10  Dated: March 2, 2013                          _____
                                                  CHARLES  R. BREYER
11                                                UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28